## INJURY TO ONE AT WORK ABOUT A SWINGING BRIDGE.

[Circuit Court of Richland County.]

JOHN L. HAUN, ADMINISTRATOR, v. THE C., C., C. & ST. L. RAILWAY CO.*

Decided, 1903.

*Negligence—Master and Servant—Vice-Principal and Fellow-Servant—Assumed Risk—Peril of Servant—Against which Master can Alone Provide Protection.*

1. Where a servant in the prosecution of the work of his employer is obliged to take a position which is not necessarily dangerous, but may be rendered dangerous by the employer putting in motion a force or machine, it is the duty of the employer to notify the servant of his intention in time for him to avoid the consequences; and this must be done each and every time such machine or force, against which the servant can not protect himself, is put in motion.

2. The duty which a master owes to his servant under such circum- . stances is one which he must perform or cause to be performed with reasonable care and diligence, and where the master causes this duty to be performed by another, the person so performing it is not a fellow-servant within the meaning of that term, as it is understood in negligence cases; but he is the vice-principal, and his negligence in that behalf is the negligence of the master, and not of a fellow-servant.

DONAHUE, J.; DOUGLASS, J., and VOORHEES, J., concur.

This action is brought by the administrator of James W. Haun, deceased, against the defendant railway company, to reverse the judgment of the common pleas court, in an action in which such administrator was plaintiff and the defendant in error defendant.

The plaintiff in that case sought to recover from the defendant for negligently causing the death of plaintiff's intestate, who was a workman in the employ of defendant company and was engaged in and about the repairs of a certain bridge owned and

*Affirmed by the Supreme Court without report, *C., C., C. & St. L. Ry.* v. *Haun, Administrator,* 73 Ohio State, ——.

operated by said company across the Cuyahoga river in Cleveland, Ohio.

From the pleadings and the evidence it appears that this was a swinging bridge operated by steam power, and was swung out fifteen to twenty-five times a day to allow boats to pass through. It further appears from the evidence that the plaintiff's intestate was required, with other laborers, to occupy a place between the parapet wall and that portion of the bridge resting on the abutments, at about seven feet below the level of the tracks; when said bridge was in its ordinary position, there was a space between this parapet wall and the bridge of about twenty inches; that when the bridge was swung clear of the abutments there was a space of from three to four feet or more and when it was swung so that the diagonal of the bridge stood at right angles with the river, this space of twenty inches was almost entirely closed, and there was no room there for workmen to stay with safety, and it was necessary, before swinging said bridge, for said workmen to leave their working place and climb to the tracks or parapet wall, where they could remain in safety until the bridge was swung.

It further appears from the evidence that when the boats approached the bridge and desired passage, they would signal their request by a whistle. This signal would be answered by the engineer of the bridge, who occupied a position in the tower above the center of the bridge, and this signal would either indicate that he would swing the bridge immediately, or, if delay was necessary, that the boat must wait until he could give it passage. These signals were known to the workmen, including the plaintiff's intestate, and they had been governing their conduct according thereto.

It further appears that the foreman in charge of said workmen would also give a verbal warning to the workmen to enable them to escape from their dangerous position before the bridge was moved. These warnings were given a sufficient length of time before moving the bridge to enable the workmen to reach a place of safety, and until the time of the accident to plaintiff's intestate, the workmen had been able, by these signals, to protect themselves from the dangers incident thereto. It further appears

from the evidence that signals were given at this particular time, and that the workmen understood and started to reach a place of safety, but it also further appears that after giving the signal, no delay whatever intervened between these signals and the moving of the bridge. In fact, the workmen were apprised by the movements of the bridge almost simultaneously with the giving of the signal that it was about to swing. At least, so the evidence stands in this record. This sufficiently appears from the direct evidence of the witnesses, but certain circumstances are testified to by the witnesses that strengthens the direct evidence very much.

Mr. Douglass, one of the workmen, and the one nearest to the avenue of escape, was barely able to reach a place of safety. Haun, the deceased, started at once to escape from the danger, and almost, but not quite, succeeded. There were two other men who also made an effort to escape, but, realizing the impossibility of their being able to do so in the ordinary way, attached themselves to the projecting parts of the bridge and swung out with it.

If all the other workmen had been able to reach a place of safety in the ordinary and usual way, and Haun alone had failed, such circumstances would weaken plaintiff's claim that sufficient time was not given. But, as the record now stands, the evidence is undisputed that only the workman who was nearest this avenue of escape was able to reach safety in the ordinary and usual way; all the others, who had been able, therefore, from fifteen to twenty-five times a day to escape this danger, were this time unable to do so, and this would certainly add somewhat to the direct evidence.

Upon this state of the record a motion was made to direct a verdict for the defendant and the motion sustained, and this proceeding is prosecuted to reverse that judgment.

There is at least some evidence going to prove that these signals were not given a sufficient length of time before the moving of the bridge to enable the workmen to escape, and that would be sufficient for the purpose of this case. But we do not think that it ends there. There was not only some evidence,

but sufficient evidence uncontradicted and unexplained, for the jury to find that fact to be true.

If it was the duty of the defendant company to protect these workmen by giving them time enough after the signal until the bridge' moved, to enable them to escape the danger, then the court erred in directing a verdict for the defendant.

This case does not present the same question that the ordinary action for damages presents.  These men accepted the dangers incident to their employment.  They deliberately and voluntarily entered into a place of danger.  But the danger did not exist when the bridge remained in its place, and it was evident to' them and evident to their employer, that this bridge could not be moved while they were in their place of working, without killing or injuring them.  Therefore, they had a right to expect that their employer would not move this bridge without warning, and crush out their lives, without giving them an opportunity to reach a place of safety—and the duty was upon the master, by every rule of right and justice, to see to it that these men had a chance to escape, not possible danger, but certain injury before undertaking to move that bridge, and we think a failure to do so was negligence upon the part of the master that would entitle the injured servant or his legal representative to recover.

Any other rule of law would shock the intelligence of civilized man.  The law regards life as too sacred to be trifled with, and while the necessity of things requires that men should incur dangers and assume many risks, in order to accomplish necessary work, yet when the danger is so patent, and it appears it can only be avoided in one reasonable way, the law requires that if that way be open to the servant, he shall avail himself of it; or, if that way depends upon the master, and the servant is helpless without such protection from the master, the master must protect him at his peril.

We think that if the servant go into a place of danger to do the work of the master, and by so doing, places it beyond his power to protect himself, where he can not watch and care for his own safety, that it becomes the duty of the master to provide such reasonable care for the safety of the servant as may be

commensurate with the danger threatened. And particularly is this true if the position in which the servant has placed himself to do his master's work is one not necessarily dangerous, but becomes dangerous by reason of the master putting in motion a machine or force that will certainly injure the servant, unless he is advised of the master's intention to put such machine or force in motion in time to avoid its consequences; and it is, in such case, the duty of the master, not only to provide for the safety of his servant, but to see to it that such servant has a reasonable opportunity to avail himself of such provision. And this must be done each and every time such dangerous machine or force, against which the servant can not protect himself, is put in motion by the master.

This master owed such a duty to the deceased. He was required not only to give these signals, but to give them in sufficient time to accomplish the purposes for which they were given. The mere giving of the warning when too late to be of any avail would not discharge the duty of the master, nor can the master escape responsibility for the failure to perform this duty upon the theory that the failure to do so was the negligence of a fellow-servant. The duty that an employer owes to his servant in such a case as the one at bar is one that he *must* perform or cause to be performed with reasonable care and diligence, and though the master may procure some one else to perform this duty for him, the person so procured, while performing this master's duty, is not a fellow-servant within the meaning of that term as understood in negligence cases, but he is, on the contrary, the vice-principal, and his negligence in that behalf is the negligence of the master, and not the negligence of a fellow-servant.

The record in this case fairly shows a failure on the part of the master to perform this duty, and the court erred in directing a verdict for the defendant. The cause should have been submitted to the jury. Judgment reversed and cause remanded.

*Mansfield & Long,* for plaintiff in error.

*Cummings, McBride & Wolfe,* for defendants in error.